# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **WALT STICKILY,** | : | |
| Plaintiff, | : | **CIVIL ACTION** |
| | : | **NO.   16-6252** |
| **v.** | : | |
| | : | |
| **COUNTY OF LANCASTER, et al.** | : | |
| Defendants. | : | |

## MEMORANDUM

**SCHMEHL, J.   /s/ JLS**                              **FEBRUARY   28, 2020**

Plaintiff, a former inmate at Lancaster County Prison, brought this action under 42 U.S.C. § 1983, claiming that the individual John Doe defendants were deliberately indifferent to his serious medical needs during two separate periods of incarceration at the Prison. Named as defendants are the County of Lancaster, two former Wardens of Lancaster County Prison, Dennis Molyneaux and Paul Smeal, Officer John Does 1-100 (collectively, Lancaster County Defendants), PrimeCare Medical, Inc, and John Does A-Z (collectively, PrimeCare Defendants).

Count One asserts a constitutional claim against the individual Lancaster County Defendants and the individual PrimeCare Defendants for deliberate indifference to Plaintiff's serious medical needs.[1] Plaintiff contends that the individual Defendants' deliberate indifference resulted in him having to undergo the amputation of the fourth toe on his left foot, a transmetatarsal amputation of his left foot and, ultimately, a below-knee amputation of his lower right leg. Count Two alleges a derivative claim against Defendants County of Lancaster and Wardens Molyneaux

---

[1] Because it is not clear whether Plaintiff was a convicted prisoner or a pre-trial detainee at the time of the events which give rise to this action, Plaintiff is proceeding under both the Eighth (applicable to convicted prisoners) and Fourteenth (applicable to pre-trial detainees) Amendments.

1

and Smeal for failing to properly train and supervise the individual Lancaster County Defendants as to proper medical care of inmates in general and of inmates with diabetes in particular. Count Two also asserts a derivative claim against PrimeCare for failing to train and supervise its medical personnel, the individual PrimeCare defendants. Count Three asserts a claim for negligence against the PrimeCare Defendants while Count IV asserts a claim against the PrimeCare Defendants for medical malpractice.

Following the completion of fact discovery, the Lancaster County Defendants and the PrimeCare Defendants filed motions for summary judgment. In his response to the motions, Plaintiff's counsel stated that, "Plaintiff hereby stipulates to the dismissal of Paul Smeal, Dennis Molyneaux, and the John Doe Defendants. This leaves only the County of Lancaster and PrimeCare as Defendants in this suit." (ECF 48-1, p.5. n.1.) For the reasons that follow, both the motions for summary judgment of Lancaster County and PrimeCare are granted.

## STANDARD OF REVIEW

Summary judgment is appropriate if there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). "A motion for summary judgment will not be defeated by 'the mere existence' of some disputed facts, but will be denied when there is a genuine issue of material fact." *Am. Eagle Outfitters v. Lyle & Scott Ltd.*, 584 F.3d 575, 581 (3d Cir. 2009)(quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-248 (1986)). A fact is "material" if proof of its existence or non-existence might affect the outcome of the litigation, and a dispute is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248.

In undertaking this analysis, the court views the facts in the light most favorable to the non-moving party. "After making all reasonable inferences in the nonmoving party's favor, there is a

genuine issue of material fact if a reasonable jury could find for the nonmoving party." *Pignataro v. Port Auth. of N.Y. and N.J.*, 593 F.3d 265, 268 (3d Cir. 2010) (citing *Reliance Ins. Co. v. Moessner*, 121 F.3d 895, 900 (3d Cir. 1997)). While the moving party bears the initial burden of showing the absence of a genuine issue of material fact, meeting this obligation shifts the burden to the non-moving party who must "set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 250.

**FACTS**

The following facts are not in dispute:[2]

1.    Lancaster County Prison is a correctional institution owned and operated by the County of Lancaster, Pennsylvania.

2.    Dennis Molyneaux is a former warden of Lancaster County Prison. Molyneaux served as Warden from October 2012 to March 13, 2013 and from April, 2014 until October, 2014.

3.    Paul Smeal is a former warden of Lancaster County Prison, having served as Warden for three different time periods starting in May of 2012 and ending in March of 2016.

4.    At all times material hereto, Dr. William Cattell is the medical director at Lancaster County Prison, but employed by PrimeCare.

5.    At all times material hereto, Thomas Weber is the Chief Executive Officer of PrimeCare. Lancaster County contracts with PrimeCare to provide healthcare services to inmates at Lancaster County Prison.

6.    Andrew Bender is a correctional officer at Lancaster County Prison.

---

[2] Counsel for the parties met and conferred and agreed on these facts. [ECF 71, 72, 73] Although there are some facts in both of the defendant's submissions which the Plaintiff disputes, the Court has either omitted these disputed facts because they are not material to resolution of the motion for summary judgment or, after reviewing the record, found that the fact was not actually in dispute.

7.  Brian Levitan is a correctional officer at Lancaster County Prison.

8.  Randolph Carpenter is a correctional officer at Lancaster County Prison.

9.  At all times material hereto, Maria Delores Rojas-Cortes is a former medical assistant employed by PrimeCare and assigned to Lancaster County Prison.

10. At all times material hereto, Charmilia Rodriguez is a former medical assistant employed by PrimeCare and assigned to Lancaster County Prison.

11. The Lancaster County Prison Policy Manual instructs correctional officers to defer to medical staff regarding providing medical treatment to inmates.

12. Lancaster County's Prison Policy Manual does not contain any provisions limiting the ability of inmates to receive necessary medical care in or outside of the prison.

13. Pursuant to PrimeCare's policies, the medical director and health services administrator serve as the responsible authority regarding the health of the inmates.

14. Thomas Weber testified that the health services administrator would be responsible for the day-to-day operation of PrimeCare, more so than the medical director.

15. Terri Flinchbaugh has been the Health Services Administrator ("HSA") for PrimeCare since 2013 and served in that capacity in the Lancaster County Prison from September of 2014 through November 2017.

16. Her duties are to oversee the day-to-day operations of the medical department at the Lancaster County Prison. She is also a liaison between PrimeCare and prison officials, and she is responsible for overseeing training of PrimeCare nursing staff.

17. The HSA has responsibility, per the policy, for "overall operations of the medical program."

18.     Flinchbaugh reports to the Warden of the Prison, and provides the Warden with a monthly report containing "anything that took place during the scope of our daily practice." She also reports to regional managers at PrimeCare.

19.     At the time of Plaintiff's two incarcerations at Lancaster County Prison, Dr. Cattell only spent one day per week at the Prison.

20.     Pursuant to PrimeCare policies, the delivery of healthcare services is a "collaborative effort" between healthcare providers and the administrators from both PrimeCare and the Lancaster County Prison.

21.     According to PrimeCare policies, PrimeCare arranges for the availability and monitoring of healthcare services, while the Lancaster County Prison provides transportation of inmates to medical providers.

22.     Molyneaux, testified that when he served as Warden, he was chief operating officer of the Prison and was responsible for developing and implementing Prison policy.

23.     Regarding the relationship between PrimeCare and Lancaster County Prison, Molyneaux testified that PrimeCare's responsibility was to provide medical services to the inmates, and that it was the Prison's responsibility to assist in the daily medical operation and to transport inmates in need of medical care.

24.     Smeal testified that as Warden, it was his responsibility to ensure that policies were being followed, and that the Warden bore responsibility to ensure that PrimeCare was abiding by the terms of the contract to provide appropriate medical services.

25.     Smeal testified that "it was a responsibility on all of us to make sure that we were receiving or the County was receiving what was outlined in the contract."

26.      Smeal testified that it was the County's responsibility to ensure that medical services were indeed being provided.

27.      When an inmate is first taken to the Lancaster County Prison, they are first screened by Prison staff and then PrimeCare staff.

28.      Per Prison policy regarding intake, the Prison is to conduct an initial intake of the inmate and complete a questionnaire regarding the inmate.

29.      If an inmate being screened has medical needs apparent to the officer handling intake, said officer must then notify the medical department.

30.      Regardless of whether there is a medical issue raised by the intake officer, the inmate is thereafter given a medical screening by a PrimeCare medical assistant.

31.      At that point, PrimeCare would evaluate the inmate and determine if it recommends for the inmate to be housed in a medical unit.

32.      PrimeCare also decides whether or not the inmate can be accepted into the Prison at all or if the inmate is instead to be sent to the hospital for medical clearance.

33.      Ultimately, PrimeCare informs the Prison as to any orders related to the inmate's medical care and restrictions.

34.      PrimeCare's own written policies stated that in the event that a medical need and a security issue conflict, the medical need is to be given priority initially, and a conversation would subsequently occur between the Prison and PrimeCare regarding the particular security concern.

35.      PrimeCare's written policies also state that no restriction is to be placed on medical personnel which would interfere with implementation of healthcare services, which

Dr. Cattell explained meant that "medically necessary healthcare is of high importance and shouldn't be impeded."

36. However, both Dr. Cattell and Molyneaux testified that they were not even aware of any policy regarding what should occur when a medical need and a security issue conflict with one another.

37. Molyneaux testified that if an inmate has a medical need, all decisions are to be made by PrimeCare.

38. He also testified that the Warden cannot give PrimeCare orders regarding an inmate's care.

39. Rather, according to Smeal, "in any situation whether a medical decision was being made, I absolutely always deferred to the medical professional."

40. These decisions include whether or not to permit an inmate to wear medically-necessary footwear.

41. Wardens Molyneaux and Smeal testified that the use of medically-necessary footwear was for PrimeCare to decide. Molyneaux testified "If you're asking, [do] we remove footwear that somebody medically needs, the answer is no."

42. Similarly, Molyneaux stated that if an inmate had "some special orthotic shoe," an intake officer should contact medical staff.

43. Warden Smeal testified that it was medical staff who "would determine whether or not a particular article of clothing and/or prosthesis is needed."

44. Officer Levitan, who handled Plaintiff's initial intake at his first incarceration, stated that it was PrimeCare's decision whether or not the inmate could keep the medical

device, such as a brace or cast, but also conceded that security would also make a decision as to whether or not the inmate should keep the medical device.

45. Levitan testified that "as long as [medical staff] approve[s] it, then that individual could wear it", and then indicated that PrimeCare would only make that decision "as long as it doesn't become a security issue."

46. Officer Bender, another officer who handled Plaintiff's intake, testified, "if they have a device on them, it gets approved by medical, then at that point it would be a question of whether security needs to check it or not."

47. Officer Levitan stated that if an inmate came in with a wheelchair or leg brace or cast, the officer would remove said medical device and then provide the medical device to PrimeCare.

48. Normally, inmates would then be issued "orange rubber Croc-type shoes."

49. Supervising officer Jason Curtis testified that an orthotic device would need to first be approved by medical, and then would only be reviewed by security if the device has "got a metal shank or something, a piece of metal that can be taken off."

50. PrimeCare Administrator Flinchbaugh testified that the use of a medical device is a "security decision" and that any such orthotic device or shoe would have to be approved by "security."

51. PrimeCare CEO Weber stated that the number of "special needs orders" for shoes was to be limited, for "security concerns."

52. Weber then testified, "in this matter, Lancaster does not allow specialized shoes to be worn by their inmates."

53.     Weber then testified that whether or not an orthotic shoe would be permitted is up to PrimeCare, noting that the contract with the County preserves PrimeCare's right to "maintain medical autonomy."

54.     When medically appropriate, inmates from Lancaster County Prison are sent to outside providers. However, it is PrimeCare, not the Prison, which is supposed to decide whether an inmate is to see an outside provider.

55.     Rather, it was the Prison's job to simply transport inmates to outside providers once ordered to do so by PrimeCare.

56.     Once an inmate sees the outside provider, a nurse will typically forward any new instructions to PrimeCare's own medical providers on site.

57.     After an inmate returns to the Prison from seeing the outside medical provider, PrimeCare would receive records from the outside medical provider, typically within 24 hours.

58.     Pursuant to PrimeCare Policies, "when the patient is returned to the prison, the highest ranking medical professional in the prison at the time will assess the patient and ensure that hospital discharge orders are carried out."

59.     Flinchbaugh testified that PrimeCare is to follow the recommendations of the outside provider.

60.     Warden Molyneaux testified that transportation for inmates to outside medical providers was always available, no matter the day or hour. "If medical requests transportation from security, we provide that transportation."

61.     The written policy of the Prison confirmed that the County is to provide such transportation whenever requested.

62.  Similarly, according to Warden Smeal, whenever a request for transportation is made by PrimeCare, the Prison would always provide said transportation, regardless of the day. Warden Smeal did not know whether this was based on a policy or custom. He testified that he all he knows is "it occurs."

63.  However, PrimeCare Medical Director Cattell testified that "the patient is never allowed to know when their appointment is going to be," but also admitted that he was not aware of any actual written policy stating as such.

64.  Dr. Cattell later testified that preexisting appointments "usually" need to be changed, for security reasons (but again admitted that he was not aware of a written policy stating as such).

65.  Ultimately, Dr. Cattell testified that if an outside provider requested an appointment on a certain day, such as a Tuesday, and that was the only day that certain procedures could be done, then "we would have to accommodate the patient on Tuesdays. That's the only day they could get their care."

66.  Ultimately, CEO Weber stated that "in an emergent situation, we have the discretion to send someone out without concurrence from security."

67.  However, Administrator Flinchbaugh – who controlled the day-to-day operations of the medical care inside the Prison - stated that even if an outside provider instructed that the inmate needed to be seen on a specific day, PrimeCare would still not necessarily follow that instruction.

68.  Flinchbaugh blamed this on security requirements imposed by the Prison, indicating that PrimeCare "cannot maintain a preexisting appointment," "as part of the guidelines that we have to operate…within the jail."

69. Flinchbaugh admitted that she was not aware of any written protocols as to what would occur if an inmate needs treatment on a certain day.

70. Prior to his incarceration, Plaintiff was being treated by the Lancaster General Health's Wound & Hyperbaric Medicine Center ("Wound Center") for issues related to Plaintiff's multiple lower extremity amputations and diabetic ulcers.

71. Plaintiff was being seen for wound care treatment on a weekly basis with appointment's scheduled every Tuesday at 2:15 p.m with podiatrist Darren B. Barbacci.

72. Plaintiff was diagnosed with diabetes in 2008. Prior to his first incarceration, Plaintiff underwent amputations of his distal right foot and part of his left big toe due to complications related to his diabetes.

73. Plaintiff was arrested on November 6, 2014 due to a parole violation which occurred on November 1, 2014. Plaintiff was transported to Lancaster County Prison for detainment for his parole violation.

74. Plaintiff's intake was performed by Officer Levitan at approximately 4:35 p.m. on November 6, 2014.

75. Indicated in Plaintiff's property was "one (1) white bag with general contents inside which contained one gray shirt, one black shoe, one pair blue jeans, one tan shirt, one pair white underwear, one white sock, one camo hat and one belt."

76. Plaintiff testified that after he was strip searched after intake, one of the guards took his diabetic shoe and toe crush, both of which he was wearing on his left foot. Plaintiff testified that the guard told him he "couldn't have it."

77. Plaintiff testified that an intake nurse and guard subsequently told him he could not have the diabetic shoe and that he would have to wear prison shoes. Plaintiff was issued orange rubber clogs.

78. Plaintiff testified that he did not make any more requests for his diabetic shoe.

79. Plaintiff was housed in the general prison population. He was restricted to a low bunk and low tier.

80. Plaintiff's medical intake on November 6, 2014 was completed by PrimeCare Medical Assistant Maria Cortes-Rojas.

81. In Plaintiff's medical intake interview, Plaintiff noted his preexisting conditions, including wound treatment for multiple amputations, diabetes, and a heart defibrillation.

82. Nurse Practitioner Lori L. Hostetter noted on November 7, 2014, that Plaintiff had a hard cast and boot on his right leg (foot amputated) and that Plaintiff goes to Wound Clinic weekly on Tuesday for evaluation of right foot condition and replacement of new cast/boot. No mention was made of a medically-necessary diabetic shoe.

83. Plaintiff reported to Nurse Practitioner Hostetter on November 7, 2014, that he had recurrent ulcers on the left foot, but stated that the Wound Center was not concerned because the sores on the left foot had not opened yet.

84. There is no notation in the charting that Nurse Practitioner Hostetter prevented Plaintiff from continuing to wear his hard cast with a boot on his lower right extremity. Nurse Practitioner Hostetter did order daily foot care and that prior treatment records from the Wound Center be obtained.

85.     A doctor's order to jailer (DOJ Orders) was issued on November 10, 2014, that Plaintiff be kept off of steps due to his boot.

86.     The PrimeCare chart demonstrates that Plaintiff was seen by nursing staff on November 7, November 8, November 9, November 10, November 11, and November 12, 2014 for dressing changes of his left foot as ordered by Nurse Practitioner Hostetter.

87.     By November 10, 2014, Plaintiff's left foot had become purulent with drainage around the third toe which extended to the second, fourth and fifth toes by November 15, 2014. By that date, the drainage from the fourth left toe had turned green and yellow.

88.     Plaintiff testified that one of the guards from the Prison asked the nurses at the Wound Center how Plaintiff received the wound on the fourth toe of his left foot and one of them responded "because he's wearing them shoes, he's supposed to be wearing his diabetic shoes."

89.     Plaintiff was scheduled for an appointment with the Wound Center for November 13, 2014.

90.     Wound Center documentation reveals a history from Plaintiff which stated in part, "Patient is now in jail and they are allowing to wear his cast and boot at all times."

91.     On November 13, 2014, Plaintiff's treating wound care doctor from the Wound Center, Dr. Fleischman, indicated in an After Visit Summary: "PATIENT MUST WEAR CAST SHOE BECAUSE CURRENT SHOE WILL CAUSE FURTHER DAMAGE…PATIENT MUST WEAR CAST SHOE AND STAY OFF FEET AS

MUCH AS POSSIBLE." (emphasis in original.) This notation was written for both the left foot and the right foot.

92. These medical records were sent to PrimeCare.

93. PrimeCare CEO Weber testified, regarding the November 13th note from Dr. Fleischmann directing the use of the orthotic shoe, that "the hospital does not have the ability to order our providers to do anything."

94. The Lancaster General Hospital records for November 13, 2014 – which were in the possession of PrimeCare--also stated that "there is distinct possibility he will wind up needing to lose that toe."

95. The Wound Center gave instructions that Plaintiff was to continue to wear his cast shoe and to stay off his feet as much as possible.

96. The Wound Center's After Visit Summary of November 13, 2014, indicate Plaintiff was also to return the following week. The Wound Center's After Visit Summary of November 13, 2014, do not state that Plaintiff had to be seen on a specific day or by a particular physician.

97. Nurse Practitioner Hostetter initialed the Wound Center's After Visit Summary on November 13, 2014. She also evaluated Plaintiff on November 13, 2014, after Plaintiff's examination at the Wound Center.

98. Nurse Practitioner Hostetter's note reveals that the Wound Center was now having dressing changes on both feet and had noted that the ulcer on the top of a left toe had opened up.

99.     Nurse Practitioner Hostetter also ordered the recommended antibiotics and instructed the nursing staff to contact the Wound Center to clarify how the dressing changes were to be performed.

100.    Plaintiff did not receive any cast shoe back from the Prison. Nurse Practitioner Hostetter ordered that Plaintiff be issued crutches for moving about his cell and a wheelchair for moving about the prison in order to keep Plaintiff off his feet.

101.    Plaintiff was examined at the Prison by Dr. Cattell on November 14, 2014. Dr. Cattell noted that Plaintiff had increased redness and infection to the left toe.

102.    Dr. Cattell ordered additional antibiotics and continued dressing changes and visits at the Wound Center.

103.    PrimeCare records reveals that Plaintiff was seen by nursing staff twice on November 13, 2014, and once per day from November 14, 2014, through November 20, 2014.

104.    Plaintiff returned to the Wound Center on November 21, 2014.

105.    A note dated November 21, 2014 from the Wound Center states " ... he was not able to wear his protective shoe, as he is presently incarcerated...."

106.    In an After Visit Summary from Plaintiff's November 21, 2014 visit, Dr. Ijaz Zia, DPM instructed, in a notation, *inter alia*, "[s]urgical shoe to left foot."

107.    There was a Discharge Summary/Release Information form which was signed by Plaintiff on the day of his discharge from the Prison on November 23, 2014, noting that Plaintiff had his blood sugar checked four times on November 23, 2014.

108.    Plaintiff's initial incarceration in November, 2014 lasted approximately 17 days.

109.    During those 17 days, Plaintiff was evaluated by a PrimeCare physician or nurse practitioner three (3) separate times.

110.    During those 17 days, Plaintiff was sent to the Wound Center on two occasions.

111.    During those 17 days, Plaintiff was seen by PrimeCare medical professionals at Lancaster County Prison five (5) times a day - twice a day on the block to be given his medications, and three times a day, namely before each meal in the medical unit, to receive his insulin.

112.    At no time during the 17 days did Plaintiff did not submit a sick call slip requesting the return of or the use of a diabetic shoe.

113.    At no time during the 17 days, Plaintiff did not submit a grievance seeking the return of or the use of a diabetic shoe.

114.    At no time during the 17 days, did PrimeCare take any cultures or x-rays of Plaintiff's lower extremities.

115.    On November 25, 2014, Plaintiff was admitted to Lancaster Hospital, where he had an amputation of his fourth toe of his left foot on November 26, 2014.

116.    On Tuesday, December 9, 2014, as he was driving to his appointment with Dr. Barbacci, Plaintiff was cited for driving without a valid license. Plaintiff was arrested on December 11, 2014 and transported to Lancaster County Prison for detainment. Plaintiff's prison intake was completed by Officer Carpenter.

117.    Plaintiff's property during his intake included: "black sandals, 1 blue sock, blue jeans, white underwear, brown T-shirt, brown shirt, blue jean jacket, black belt."

118.    Plaintiff was allowed to retain the black sandals per the instructions of the medical department at Lancaster County Prison. The Receiving Screening revealed that

Plaintiff had left foot surgery which involved the removal of a joint from his toe and that he had an ulcer on the bottom of his right stump. Further, the Receiving Screening revealed that Plaintiff had a diabetic cast on his right extremity with a boot. His intake forms for the second incarceration indicated "left big toe amputated, right foot amputated."

119.    The PrimeCare medical assessment made during Plaintiff's intake at his second incarceration notes that Plaintiff suffered from insulin-dependent diabetes mellitus, coronary artery disease, hypercholesterolemia, hypertension, and an open ulcer on his right stump.

120.    On the day Plaintiff was arrested and detained by local police (leading to his second incarceration), he was driving to the Wound Care Center to have the diabetic cast on his right extremity removed and replaced by Dr Barbacci. The only time Dr. Barbacci performed such procedures at the Wound Center was Tuesday afternoons.

121.    A doctor's order to jailer was issued on December 11, 2014, which permitted Plaintiff to have bilateral walking boots and to be housed in Administrative Segregation. Nurse Practitioner Hostetter issued an order to continue Plaintiff on medications and for him to keep his walking boots if approved by security.

122.    Plaintiff was evaluated by Nurse Practitioner Hostetter on December 12, 2014. After evaluation, Nurse Practitioner Hostetter's plan was for Plaintiff to continue on his medications and to consult with the Wound Center for further management.

123.    PrimeCare notes from November 7, 2014 indicated that the Wound Center informed PrimeCare of Plaintiff's recurring Tuesday appointments with Dr. Barbacci, but the

PrimeCare nurse who received the call told the Wound Center that Plaintiff would need to change the appointment.

124.    In response, the Wound Center stated that such a change would "not be possible, because the doctor comes in on Tuesday afternoons only to do the dressing changes."

125.    In response, the PrimeCare nurse indicated that the change of appointments was necessary "per security."

126.    Multiple phone calls were made by the PrimeCare staff to the Wound Center on December 12, 2014.

127.    At approximately 15:30 hours, the Wound Clinic returned the calls.

128.    The Wound Center recommended that the cast on Plaintiff's right extremity should be removed right away. The PrimeCare nurse entered the following note: "Spoke to Nurse Lauren from Wound Clinic regarding dressing change recommendations to left toe. Nurse and DR are concerned about right contact cast being removed PT was to have case removed on Tues. PT is to be total non wt bearing it is very important PT has cast removed ASAP D/T possible loss of limb. Left foot is to be cleansed with soap and water and dry dressing applied every other day and prn for drainage."

129.    In response, Dr. Cattell sent Plaintiff to the emergency room at Lancaster Hospital on Friday, December 12, 2014 to have the diabetic cast removed from his lower right extremity.

130.    Plaintiff was seen in the ER by Dr. Creston Tate who admitted he was not equipped to handle the removal and replacement of Plaintiff's cast. Dr. Tate made arrangements for Plaintiff to be seen at the Wound Center on the following Tuesday, December 16, 2014, when Dr. Barbacci was there. Specifically, Dr. Tate informed

PrimeCare "I spoke with the podiatrist to place the splint and he was agreeable to leaving the cast in place until his Tuesday appointment at the wound center at LGH health campus. He should continue to wear the cast shoe cast stabilizer. Regular wound care of the left foot would be appropriate."

131. Because of security concerns, namely that an inmate was not permitted to know his appointment schedule in advance, Plaintiff was not sent to the Wound Center on Tuesday, December 16, 2014 but was sent on Wednesday, December 17, 2014, when Dr. Barbacci was not there. Dr. Steven Woratyla was able to remove Plaintiff's diabetic cast.

132. In a letter dated December 17, 2014, Dr. Woratyla wrote that "[w]e will stop his total contact cast on the right foot. . ."

133. There is no evidence that Plaintiff's diabetic cast on his lower right extremity was ever replaced during the remainder of Plaintiff's incarceration at the Prison or any time thereafter.

134. Instead, Plaintiff had his dressings changed every day by nursing staff or by the Wound Center staff until he was discharged on January 16, 2015.

135. By December 22, 2014, there were two new abrasions on the right stump. Open wounds times three were present on the left foot by December 24, 2014.

136. On January 2, 2015, Dr. Michael Flood noted two ulcers of the left foot, and ulcers of the right stump.

137. Dr. Flood debrided the ulcers and prescribed Cipro, Santyl (debriding agent) and Iodosorb (antibiotic ointment).

138.    Dr. Flood gave detailed instructions as to the daily care and redressing of the ulcers, and recommended that Plaintiff be seen by Dr. Barbacci.

139.    There was a new ulcer on the left foot on January 5, 2015.

140.    PrimeCare notes indicate that there was a new ulcer on the left second and third toe, metatarsal area, and that "wound looks worse."

141.    There was also swelling, redness and ulcerations on the dorsum of the foot by January 6, 2015.

142.    Plaintiff was sent to the Wound Center and was seen on January 2, 2015, January 7, 2015, and January 9, 2015, by Dr. Flood. By January 7, 2015, notes from the Wound Center documented cellulitis of the right stump. The ulcers had become worse.

143.    The Wound Center also noted possible osteomyelitis and need for amputation.

144.    On that date, PrimeCare acknowledged in a note that the Wound Center indicated that Plaintiff's condition was "looking bad" and that further amputation would be necessary on his left foot.

145.    On January 9, 2015, Stickley was seen again in the Wound Center by Dr. Flood. New wounds on the left foot were noted.

146.    On January 16, 2015, Plaintiff was released from the Prison.

147.    He visited the Lancaster General Emergency Room on January 16, 2015 and again on January 17, 2015, at which point he was admitted to the hospital.

148.    He had open, infected ulcers of the left leg and open wounds of the right stump at the base of the foot.

149.    On January 21, 2015, Dr. Flood performed a transmetatarsal amputation of the left foot.

150. On September 18, 2015, Plaintiff underwent a below-knee amputation of the right leg.

151. From December 12, 2014, through his discharge on January 16, 2015, Plaintiff was examined at the Prison by a physician, physician assistant or a nurse practitioner on 12 separate occasions.

152. During Plaintiff's second incarceration, there were multiple phone calls between PrimeCare staff and the Wound Center to discuss Plaintiff's condition and treatment.

153. Plaintiff had blood drawn and laboratory studies on November 17, 2014, December 19, 2014, December 21, 2014 and January 6, 2015.

154. Prior to his incarcerations, Plaintiff treated with the Wound Center for years, and he received treatment from providers other than Dr. Barbacci.

155. For example, on October 24, 2014 (just weeks before Plaintiff's first incarceration), Plaintiff received treatment from Ijaz Zia, DPM which included debridement and cast removal. There is no notation that Dr. Zia was able to replace Plaintiff's cast.

156. Orders were given for Plaintiff to receive blood sugar checks three or four times a day, and his blood sugar was checked three or four times a day throughout both his incarcerations.

157. Plaintiff was also ordered to receive regular insulin on a sliding scale to treat his diabetes.

158. Plaintiff was seen throughout his incarceration by PrimeCare professionals at Lancaster County Prison approximately five (5) times a day to provide Plaintiff with medicine and to clean and rebandage Plaintiff's wounds.

159. Wardens Paul Smeal and Dennis Molyneaux had no direct contact with Plaintiff.

## DISCUSSION

In order to find the County of Lancaster and PrimeCare liable on Count II, Plaintiff must first establish an underlying constitutional violation. The Plaintiff alleges that officials from the Lancaster County Prison and PrimeCare committed a constitutional violation when they were deliberately indifferent to Plaintiff's serious medical needs.

The two prong test for deliberate indifference stems from *Estelle v. Gamble*, 429 U.S. 97 (1976). "First, plaintiff must make an 'objective' showing that the deprivation was 'sufficiently serious,' or that the result of defendant's denial was sufficiently serious. Additionally, the plaintiff must make a 'subjective' showing that defendant acted with 'a sufficiently culpable state of mind.'" *Estate of Thomas v. Fayette County*, 194 F. Supp. 3d 358, 370 (W.D. Pa. 2016). As the Supreme Court has explained, "deliberate indifference entails something more than mere negligence" and is a subjective standard that requires the official to both "be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists" and to "also draw the inference." *Farmer v. Brennan*, 511 U.S. 825, 835-37 (1994).

Our Court of Appeals has found deliberate indifference where "(1) prison authorities deny reasonable requests for medical treatment, (2) knowledge of the need for medical care is accompanied by the intentional refusal to provide it, (3) necessary medical treatment is delayed for non-medical reasons, and (4) prison authorities prevent an inmate from receiving recommended treatment for serious medical needs." *Pearson v. Prison Health Service*, 850 F. 3d 526, 538 (3d Cir. 2017). Prison officials are not permitted to either deny "reasonable requests" for medical treatment or opt for "easier and less efficacious" treatment plans. *Palakovic v. Wetzel*, 854 F.3d 209, 228 (3rd Cir. 2017).

With respect to disputes over adequate medical treatment, "federal courts are generally reluctant to second guess medical judgment and to constitutionalize claims which sound in state tort law," *Palakovic*, 854 F.3d at 228 (citing *United States ex rel. Walker v. Fayette Cty.,* 599 F.2d 573, 575 n.2 (3d Cir. 1979) (internal quotations and citation omitted)), because questions of medical treatment remain "a question of sound professional judgment." *Palakovic*, 854 F.3d at 228. Simple disagreement about the proper course of medical treatment is insufficient to establish deliberate indifference. *Pearson*, 850 F.3d at 535. Deliberate indifference is a higher standard than negligence and may be difficult to establish, because prison medical officials have leeway in diagnosing and treating inmates. *Estelle,* 429 U.S. at 105-06; *Durmer v. O'Carroll,* 991 F.2d 64, 67 (3d Cir. 1993). Thus, a mere violation of the "standard of care," such as negligence, will not suffice to rise to the level of a constitutional infringement. *Pearson*, 850 F.3d at 538 (citing *Estelle,* 429 U.S. at 106).

The Supreme Court in *Estelle* elaborated:

> [A] complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment. Medical malpractice does not become a constitutional violation merely because the victim is a prisoner. In order to state a cognizable claim, a prisoner must allege *acts or omissions sufficiently harmful* to evidence deliberate indifference to serious medical needs.

*Estelle,* 429 U.S. at 106 (emphasis added).

The parties do not dispute that Plaintiff has satisfied the first prong of the *Estelle* test, i.e., that he suffered from a serious medical condition during his two incarcerations at Lancaster County Prison. *See Atkinson v. Taylor*, 316 F.3d 257, 266 (3d Cir. 2003) (recognizing a serious medical need includes one that "has been diagnosed by a physician as requiring treatment"). Indeed, Plaintiff's diabetic ulcers and lower extremity amputations obviously constitute a serious medical

condition. Therefore, the Court only needs to determine whether there is sufficient evidence from which a reasonable jury could find that any Lancaster County Prison or PrimeCare official acted with deliberate indifference toward Plaintiff's serious medical needs.

Given Plaintiff's history of diabetes and amputations, Plaintiff was going to present a challenging medical situation for the Lancaster County Prison and PrimeCare. Nevertheless, Plaintiff himself testified that while incarcerated at Lancaster County Prison, he received insulin shots three times a day, medication twice a day and dressing changes for his lower extremities every evening.

Defendants argue that given the amount of documented medical treatment PrimeCare officials gave to Plaintiff during his two incarcerations at Lancaster County Prison, a reasonable jury could not conclude that any official acted with deliberate indifference to Plaintiff's serious medical needs. Indeed, during Plaintiff's first incarceration, Nurse Practitioner Hostetter ordered dressing changes for Plaintiff's left foot as well as antibiotics. After examining Plaintiff on November 14, 2014, Dr. Cattell ordered additional antibiotics, continued dressing changes and visits at the Wound Center. It is undisputed that during the 17 days he was incarcerated, Plaintiff was evaluated by a PrimeCare physician or practitioner on three separate occasions, was sent to the Wound Center on two occasions and was seen by PrimeCare medical professionals five times a day, twice to be given his medications and three times a day to receive his insulin.

During Plaintiff's second incarceration, Nurse Practitioner's Hostetter's plan was to continue Plaintiff's medications and consult with the Wound Center for further management. On December 12, 2014, in response to Nurse Lauren's that Plaintiff's cast on his right extremity needed to be removed ASAP, Dr. Cattell arranged for Plaintiff to be immediately taken to Lancaster General Hospital to have the cast removed. After learning that Dr. Tate was unwilling

to remove the cast, Dr. Cattell consulted with Dr. Tate who reported that It would be proper for Plaintiff to be seen by Dr. Barbacci at his regular appointment in four days. During his second incarceration, Plaintiff was examined at the Prison by a physician, physician assistant or a nurse practitioner on 12 separate occasions. There were also multiple calls between PrimeCare staff and the Wound Center to discuss Plaintiff's condition and treatment. Plaintiff also had blood drawn and laboratory studies performed on multiple occasions.

Plaintiff admits he received substantial care during his two periods of incarceration, but points to two specific instances, one during each incarceration, both of which he contends constitutes deliberate indifference in the context of a delay or denial of medical treatment. In a claim for deliberate indifference based on delay or denial of medical treatment, a plaintiff must demonstrate from the "surrounding circumstances. . . . that the delay or denial was motivated by non-medical factors." *Pearson*, 850 F. 3d at 537.

First, Plaintiff contends that officials at Lancaster County Prison demonstrated deliberate indifference when they allegedly confiscated a prescribed diabetic shoe he contends he was wearing on his left foot at the time of his initial intake on November 6, 2014 and that PrimeCare officials demonstrated deliberate indifference when they ignored the After Visit Summary from Dr. Fleischman of the Wound Center that Plaintiff needed to wear this diabetic shoe and stay off his feet.

While Defendants argue that there is no objective evidence in the record that Plaintiff was wearing a "diabetic" shoe at the time of his intake on November 6, 2014, indeed, intake records reveal only that Plaintiff possessed one "black" shoe, Plaintiff testified that he was wearing a diabetic shoe on his left foot at the time of his intake. While Plaintiff's testimony would normally be taken as true for purposes of creating a fact issue, any dispute is not material because there is

no evidence in the record, including any testimony from Plaintiff, that he informed any Lancaster Prison official or any member of the medical staff of PrimeCare either at intake or throughout his incarceration that the shoe was medically-necessary. In addition, the parties do not dispute that at no time during his incarceration, did Plaintiff submit a sick-call slip or file a grievance requesting that he be allowed to wear a diabetic shoe. A reasonable jury could not find a prison or medical official to be deliberately indifferent to an inmate's medical need of which the official is unaware.

Plaintiff claims, however, that prison and medical officials should have at least been aware of the need for Plaintiff to wear his diabetic shoe following Plaintiff's visit to the Wound Center on November 13, 2014, when Dr. Fleischman stated in a medical note: "PATIENT MUST WEAR CAST SHOE BECAUSE CURRENT SHOE WILL CAUSE FURTHER DAMAGE…PATIENT MUST WEAR CAST SHOE AND STAY OFF FEET AS MUCH AS POSSIBLE."(emphasis in original). Plaintiff also refers to records from the Lancaster General Hospital on November 13, 2014 – which were in the possession of PrimeCare—that warned "there is distinct possibility he will wind up needing to lose that [fourth left] toe." Further, a note dated November 21, 2014 from the Wound Center states " … he was not able to wear his protective shoe, as he is presently incarcerated…."

Although no Prison nor PrimeCare official secured Plaintiff's diabetic shoe following PrimeCare's receipt of Dr. Fleichman's After Visit Summary of November 13, 2014, Nurse Practitioner Hostetter did respond by ordering a wheelchair for Plaintiff to move about the Prison and keep off his feet. In addition, Plaintiff has failed to present any evidence from which a reasonable jury could conclude that Nurse Practitioner Hostetter or any other Prison or PrimeCare official recognized any risk to Plaintiff not having his diabetic shoe and then deliberately chose not to follow Dr. Fleischman's instructions. This is especially important because up to the date of

Dr. Fleischman's note, there is no evidence that any prison or medical official was even aware that Plaintiff's diabetic shoe was medically-necessary. In the absence of any evidence of subjective intent on the part of any official not to follow or recklessly disregard Dr. Fleischman's instructions, any failure by Prison or PrimeCare officials to follow Dr. Fleischman's instructions amounts at best to negligence or inadvertence. Neither negligence nor inadvertence rise to the level of deliberate indifference for purposes of the Eighth and Fourteenth Amendments.

Plaintiff also contends that Prison and PrimeCare medical officials were deliberately indifferent when they refused to allow Plaintiff to attend his regularly scheduled appointment on Tuesday, December 16, 2014 at the Wound Center with Dr. Barbacci. Dr. Barbacci only performed dressing changes and cast replacements at the Wound Center on Tuesday afternoons. When Plaintiff arrived at the Prison on December 11, 2014, he was wearing a cast boot on his right extremity. During the Tuesday sessions, Dr. Barbacci would remove this cast boot, apply new dressings and fit Plaintiff with a new cast boot. Notes from PrimeCare on November 7, 2019 revealed that the Wound Center had informed PrimeCare of Plaintiff's recurring Tuesday appointments with Dr. Barbacci, but that PrimeCare informed the Wound Center that these recurring appointments would have to be changed "per security." For security reasons, Plaintiff was not permitted to know the day and time of his scheduled appointments with Dr. Barbacci.

On Friday, December 12, 2014, Nurse Lauren from the Wound Clinic recommended to PrimeCare staff that the cast on Plaintiff's right leg should be removed "ASAP [due to] possible loss of limb" since Plaintiff had been unable to attend his appointment to remove the cast on Tuesday, December 9, 2014.

In response, Dr. Cattell sent Plaintiff to Lancaster General Hospital where he was seen by Dr. Tate. Although Dr. Tate stated that he would be able to remove the right contact cast from

Plaintiff's right extremity, he also stated that he would be unable to fit Plaintiff with a new cast. As a result, Dr. Tate and Dr. Cattel agreed that it would be appropriate for Plaintiff to wait to have his current cast removed and new cast fitted during his regularly scheduled appointment on Tuesday, December 16, 2014 with Dr. Barbacci. However, the Prison and PrimeCare would not allow Plaintiff to attend that appointment with Dr. Barbacci because of security concerns.

Plaintiff was taken to the Wound Center the very next day on Wednesday, December 17, 2014, a day on which Dr. Barbacci was not at the Center. Instead, Plaintiff was seen by Dr. Woratyla who was able to remove the total contact cast on Plaintiff's right foot. Dr. Woratyla also wrote in a letter that "we will stop the total contact cast on his right foot."

Again, Plaintiff has not presented any evidence of deliberate indifference on the part of any Lancaster County or PrimeCare official with respect to the care of his right extremity. Dr. Cattell immediately arranged for Plaintiff to go to the Emergency Room at Lancaster General Hospital to have his cast removed when he learned of Nurse Lauren's warning. Although Dr. Tate did not want to remove the cast because he would be unable to replace it with a new cast, Dr. Cattell received the blessing of a podiatrist at the Wound Center for Dr. Barbacci to remove Plaintiff's cast and fit Plaintiff with a new cast four days later. Although Lancaster Prison refused to take Plaintiff to the Wound Center on Tuesday due to security concerns, the Prison did take him the very next day. Unfortunately, Dr Barbacci was not present at the Wound Center that day. However, Dr. Worytala was able to remove Plaintiff's cast, which was the main concern of Nurse Lauren. In addition, there is no evidence in the record that the cast was in fact subsequently replaced by Dr. Barbacci.

In addition, prior to his incarcerations, Plaintiff treated with the Wound Center for years, and he received treatment from providers other than Dr. Barbacci.  For example, on October 24,

2014 (just weeks before Plaintiff's first incarceration), Plaintiff received treatment from Ijaz Zia, DPM which included debridement and cast removal. There is no notation that Dr. Zia was able to replace Plaintiff's cast.

Plaintiff contends that Lancaster County and PrimeCare officials exhibited deliberate indifference to Plaintiff's serious medical needs when they elected to follow an unwritten custom of Lancaster County Prison of not allowing an inmate to know on what day their off-site appointment was scheduled. The Court does not agree. There is no evidence in the record that the one-day delay caused Plaintiff any additional risk, especially since his cast was not replaced even when he was released. In addition, the delay was not the result of any malice on the part of Lancaster County or PrimeCare officials directed to Plaintiff, but was due to Prison customs concerning security that, though unwritten, were apparently followed by certain Prison and PrimeCare officials. Security concerns are a legitimate penological interest. While the Prison perhaps could have chosen to be more flexible given that Plaintiff was incarcerated for non-violent crimes (and indeed PrimeCare's written Policy was that in the event that a medical need and a security issue conflict, a conversation between Prime Care and the Prison regarding the security concern was to take place), the failure to engage is not indicative of deliberate indifference.

Having found that there is no evidence from which a reasonable jury could find that Plaintiff has established his underlying constitutional claim, the Court need not consider Plaintiff's derivative claims against Lancaster County and PrimeCare. Therefore, judgment will be entered in favor of the County of Lancaster and PrimeCare and against the Plaintiff on Count Two.

With respect to Counts Three and Four, under 28 U.S.C. § 1367, a federal court may exercise supplemental jurisdiction over state law claims "that are so related to claims in the action within [the court's] original jurisdiction that they form part of the same case or controversy under

Article III of the United States Constitution." Stated otherwise, a prerequisite to the federal court's exercise of pendent jurisdiction over a plaintiff's state law claims is that at least one claim based on the court's original diversity or federal question jurisdiction is before the court. See 28 U.S.C. § 1367. When "the district court has dismissed all claims over which it has original jurisdiction," the district court has the express authority to decline to exercise supplemental jurisdiction over any related state law claims. 28 U.S.C. § 1367(c)(3). See also *Growth Horizons, Inc. v. Del. County, Pa.*, 983 F.2d 1277, 1285 (3d Cir.1993); *Greenwood Partners, L.P. v. Cimnet, Inc.*, No. 201CV06624LDD, 2003 WL 22238981, at *4 (E.D. Pa. Sept. 2003) ("a district court may decline to exercise supplemental jurisdiction if it has dismissed all claims over which it has original jurisdiction").

Here, Plaintiff's Section 1983 claim was the sole basis of the Court's original jurisdiction. For reasons already discussed, the Section 1983 claim fails as a matter of law. As a result, the Court is well within its right to refuse to exercise supplemental jurisdiction over Plaintiff's remaining state law claims. Those claims, therefore, are dismissed under Rule 12(b)(1) for lack of subject matter jurisdiction. Therefore, the Court will dismiss Counts III and IV without prejudice to Plaintiff bringing these claims in the appropriate state court.

An appropriate Order follows.